# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF ALABAMA

*In re:*                                )
                                        )
                                        )
CLEARPOINT CHEMICALS, LLC,              )           CASE NO: 20-12274-JCO-11
                                        )
Debtor.                                 )

## MEMORANDUM ORDER AND OPINION

This matter came before the Court for confirmation hearing on the Debtor's Third Amended Plan ("Plan")(doc. 642), final approval of the Second Amended Disclosure Statement (doc.518) and the Objection to Confirmation by the Unsecured Creditor's Committee ("Objection") (doc. 612). Proper Notice of Hearing was given and appearances were noted on the record. Upon consideration of the pleadings, the record, the evidence including the testimony of witnesses and experts, and arguments presented during the two-day hearing and the briefs of counsel, the Court determines that the Objection is hereby OVERRULED, the Disclosure Statement is APPROVED and the Plan, as amended, is CONFIRMED for the following reasons:

## UNDISPUTED FACTS[1]

The Debtor, Clearpoint Chemicals, LLC, ("Clearpoint") is owned by John Harlan Foster ("Foster") and Todd Rader ("Rader") with each having a 50% membership interest and Foster serving as its Manager and President. Clearpoint does not own any real property and its accounts receivable, chemical and other inventory, equipment, computers, office furniture and vehicles, which with few exceptions, are encumbered by the valid, perfected liens of secured creditors. The

---

[1] Before commencement of the confirmation hearing, the Debtor and the Unsecured Creditor's Committee submitted a Stipulation of Undisputed Facts, the summation of which is set out in this section. (Doc. 633 ).

1

Debtor also owns a 73.33% membership interest in Silverback Chemicals, LLC ("Silverback"). The Debtor's gross revenue grew from $7,084,926 in 2016 to $50,884,381 in 2019. The Debtor's revenues decreased significantly in 2020. From January 2020 to September 2020, the Debtor's gross revenue was $7,233,366. Over the same time, its costs of sales were $4,717,023.46, and its expenses were $5,442,501.99. As reflected on its Income Statement for January 2020 to September 2020, the Debtor's net ordinary income in 2020 was negative $2,926,159.53. Clearpoint was insolvent as of December 31, 2017 and remained so through the Petition Date.

PROCEDURAL BACKGROUND

Clearpoint petitioned for relief under Chapter 11 of the Bankruptcy Code on September 29, 2020 ("Petition Date") and has continued to operate post-petition as a debtor-in-possession. The Court appointed a Committee of Unsecured Creditors (the "Committee") comprised of Finoric, LLC, Oilfield Solutions, Inc., and Isomeric Industries, Inc. The Debtor was authorized to obtain DIP financing ("DIP Order")(doc. 174) from the DIP lender, Clearpoint Industries, LLC ("Industries"), which is owned by Foster and Rader. Initially, the DIP Order permitted a loan up to $600,000 and allowance of an administrative expense as set out therein. Later an increase in the DIP loan amount to $830,000 was approved. (Doc. 590). Additionally, UMB Bank factored the Debtor's receivables prior to the Petition Date and has continued to do so as authorized by Order of this Court. UMB's first position lien on accounts receivable is subject to and based on an intercreditor agreement with ServisFirst Bank. Under that agreement, ServisFirst subordinated its lien on receivables to UMB. ServisFirst exercised its option to terminate the intercreditor agreement in early 2021 but agreed to extend the termination date until the confirmation hearing.

The Debtor filed its initial Plan of Reorganization and Disclosure Statement on January 4,

2021 and an Amended Plan and Amended Disclosure Statement on May 10, 2021. Later, the Debtor entered negotiations with the Plan Sponsor and filed its Second Amended Plan of Reorganization ("Plan") (doc. 517) and Second Amended Disclosure Statement (doc. 518) along with Exhibits 1-4 (docs. 520-523) on July 22, 2021. The exhibits included a five-year forecast of projections for Clearpoint ("Debtor's Initial Projections"). (Doc.522). The Committee stipulated that the Debtor's Second Amended Disclosure Statement provides adequate information as defined by Bankruptcy Code §1125(a).(Doc. 633 at 5. ¶33). The Second Amended Plan provided in pertinent part:

a.  The Plan Sponsor will contribute $6 million to fund the Plan through a special purpose vehicle CHEMCO Innovations Holdco, LLC (the "New Equity Holder");

b.  All Allowed Administrative Expense Claims and Priority Tax Claims will be paid in full on the Distribution Date unless otherwise agreed upon by the Holder of such claim and the Reorganized Debtor or ordered by the Court;

c.  All Chapter 11 quarterly fees owed the Bankruptcy Administrator for a quarter ending prior to the Effective Date will be paid no later than 30 days after the Effective Date.

d.  ServisFirst Bank[2] will be paid the full amount of its prepetition claims with interest and will receive $2 million on the Distribution Date followed by installments over 5 years beginning on the first full month following the Effective Date;

---

2 ECF Claim 54-1 evidences that as of the Petition Date, the Debtor owed ServisFirst $3,353,182.11 which is fully secured by the Debtor's assets including but not limited to: Accounts, Chattel Paper, Deposits, and FF&E.

e.     SmartBank[3] and 22nd State Bank[4] will be paid the full amount of their respective pre-petition claims with interest over five years;

f.     Ally Bank and MVB Bank will be paid the amount of their Allowed Secured Claims pursuant to the terms of their pre-petition loan documents;

g.     ServisFirst, SmartBank, 22nd State Bank, Ally Bank and MVB Bank will retain their liens on their respective collateral until they are paid in full under the Plan;

h.     Class 6 general unsecured creditors would receive their pro rata share of $400,000 on the Distribution Date if Class 6 votes to accept the Plan, and that Class 6 creditors will not receive a distribution under the Plan if that class rejects the Plan.

The ballots submitted in connection with the Second Amended Plan reflected that three of the four impaired classes entitled to vote, accepted the plan. (doc. 625). The only impaired class which rejected the plan was Class 6: Unsecured Claims and of that class 75% in number voted to accept the plan while 77% in amount voted to reject the plan, thereby rendering the plan rejected by the General Unsecured Creditor Class.

The Debtor filed a Third Amended Plan (doc. 642 ) on September 2, 2021 providing for assumption of certain executory contracts, incorporating terms resolving limited objections of various priority and secured creditors and removing the provision requiring holders of unsecured claims to vote in favor of the plan to receive a distribution.  There was no dispute that the amendments proposed in the Third Amended Plan were beneficial to Creditors and the Unsecured Creditors' Committee did not object to the revisions.  Thereafter, in the course of the confirmation

---

3 ECF Clam 61-1 evidences that as of the Petition Date, the Debtor owed SmartBank, $354,127.10, which is fully secured by the Debtor's equipment.
4 ECF Claims 45-1 and 46-1 evidence that as of the Petition Date, the Debtor owed 22nd States Bank, $426,024.59 and $1,768,735.85 which was fully secured by the Debtor's equipment and trailers.

hearing, the parties continued to negotiate and the Third Amended Plan was orally amended to increase the proposed distribution to the general unsecured creditor class from $400,000.00 to $750,000.00[5]. The Third Amended Plan as orally amended is hereinafter referred to as "the Plan".

TESTIMONY

The Debtor presented the testimony of John Harlan Foster ("Foster"), Clearpoint's President and CEO, Gentry T. Beech as representative of the proposed plan sponsor, Highground Holdings, LLC, ("Highground") as well as its experts Paul Gariepy ("Gariepy") of Three Rivers Capital, LLC and David W. Carickhoff ("Carickhoff"). The Committee offered the expert testimony of Stacie Cummings of Wilkins Miller, LLC ("Cummings"). The parties stipulated to the experts' qualifications and admissibility of their reports.[6]

Foster testified that Clearpoint grew rapidly from its 2015 formation until 2019 when it experienced a slowdown. He attributed the 2019 downturn largely to one customer and said that at that time he thought the Company would rebound. However, by April 2020, the Company was losing money and due to the effects of the coronavirus, falling oil prices, and the threat of lawsuits from vendors it opted to file for Chapter 11 bankruptcy. Foster testified regarding the precarious financial condition of the Company including that: (1) all its hard assets and accounts receivable are encumbered; (2) the values of its furniture, fixtures and equipment have continued to decline post-petition; (3) the Silverback entity (which it holds an interest) is closed and worthless; (4) there is no value to any Company claims against third parties; (5) there is no equity in its assets; and (6) it would have been unable to pay its ongoing expenses without the DIP LOAN, under which

---

5 The increased amount to the general unsecured creditor class was derived from a combination of a reduction in the initial lump-sum payment to ServisFirst from $2,000,000.00 to $1,800,000.00 (which the Court understands was by consent to facilitate plan confirmation) as well as a total of $150,000.00 from Foster and Rader to be acquired from individual personal loans.

6 The Court afforded the experts' testimony the weight it deemed appropriate, noted that Carickhoff is not an accountant and Gariepy is not an attorney and did not give credence to any testimony invading the province of the Court.

5

$745,000 had been extended as of the hearing; and (7) it is out of cash. Foster testified that he and his co-owner, Todd Rader (personally and by and through entities owned by them) previously made equity contributions and loans to the Debtor to facilitate the Company's continued operations. He stated that he has tried to market the Company and has met with over thirty interested parties and engaged in significant discussions with three but nothing led to a binding offer until to present plan sponsor, Highground. Foster stated that absent confirmation of the Plan, the Company will be unable to pay its administrative claims, meet the next payroll or continue to operate.

Foster testified that his August 2021 Financial statement, reflecting a negative net worth of $8,759,557.00 (Debtor's Ex.6) was accurate, his hard assets are pledged and have no realizable equity, ServisFirst obtained a charging lien against him, and he is contemplating individual bankruptcy. He also testified that with regard to the various companies in which he holds an interest: (1) several are no longer viable; (2) his membership interests in Crown Group Inc. and Crown City Mexico relate to casino and hotel operations in El Savador and Mexico which are not operating or have been operating at a loss because of the COVID pandemic; and (3) he has not been receiving distributions from any of his membership interests in the various entities listed.

Gentry Beech ("Beech") testified as the Managing Member of the Plan Sponsor, Highground. Beech had a prior relationship with Rader in another endeavor and entered into discussions with him related to Clearpoint in May or June of this year. His testimony set forth that Highground was not interested in sponsoring the initial plan and is not willing to participate in an auction, serve as a stalking horse bidder or retain the existing management. Beech explained that Highground would not be willing to purchase the company out of Chapter 7 because it has more value as a going concern with employees and equipment in place. His assessment was that the six-

million dollar plan sponsor contribution is likely high as of the confirmation hearing, given the continued deterioration of the Company's value, but Highground is willing to pay more than it believes the assets are worth to accelerate the timeline for the business opportunities going forward.

If the plan is approved, Chemco Innovations Holdings, LLC ("Chemco") will hold one hundred percent of the membership interest in the reorganized Debtor. Foster will not have any relationship or interest in the reorganized Debtor. Likewise, Rader will not have any direct membership interest in the reorganized Debtor. However, Rader will have a small interest funded for him in Chemco approximating $100,000.00. Beech testified that the less than two percent (2%) anticipated interest to be funded for Rader, is not on account of his equity interest in the Debtor, but is given in anticipation of consulting type services that Rader can offer going forward because of his business development skills and relationships.

When asked about potential claims or causes of action that may exist against the current equity holders of the Debtor, Beech testified that although he is unsure as to the viability or collectability of any such claims at this point, the retention of those claims is necessary to Highground's sponsorship of the plan. He explained that the reorganized Debtor must retain and control those claims to avoid any third parties "causing drama", distracting the business going forward, or otherwise affecting customers and that the Plan Sponsor would not proceed without retaining the potential claims.

David W. Carickhoff("Carickhoff"), an attorney and Chapter 7 Trustee in the District of Delaware, testified as an expert on behalf of the Debtor. He evaluated the potential Chapter 5 claims against Foster and Rader and testified about the methods, analysis and determinations set out in his report. (Debtor's Exhibit 4). Carickhoff concluded that the Debtor has viable claims

7

against Foster and Rader for fraudulent transfers, preferential transfers, unlawful distributions and breach of duty claims (collectively "Litigation Claims") . His testimony set forth his valuation of the potential Litigation Claims including their gross value, anticipated net value, likely defenses, litigation and administrations costs and potential collectability considering the financial condition of the insiders and the competing claims of other creditors.

Carickhoff concluded that if the case is converted to Chapter 7, the following recoveries could likely be realized: (1) $187,500.00 to $562,500.00 on the breach of duty claims if a settlement could be reached under the Debtor's Directors and Officers Insurance; (2) $100,000.00 fraudulent transfer and unlawful distribution claims against Foster; and (3) $56,708.00 on the preferential transfer claims against Rader. He also indicated that he did not consider this a situation in which the insiders looted the company to the detriment of creditors but rather that they contributed substantial amounts to the Company, had confidence in its success and believed that the Debtor had the ability to pay its debts when they received distributions.

Paul Gariepy of Three Rivers Capital, LLC, testified about his opinions on the liquidation value of Clearpoint's assets and the basis for his opinions as detailed in his report (Debtor's Ex. 5). He provided a lower, middle and higher range of potential recovery for each category of the Debtor's Balance Sheet Assets[7] and upon reconciling those with the secured liens thereon, he concluded that the liens would fully absorb the available funds that could be recovered in all the lower, middle and higher potential recovery ranges. Gariepy further testified that in his opinion, upon liquidation of the Company's Balance Sheet Assets even assuming recovery on the Litigation Claims in the highest range[8], there would be no distribution available for the unsecured creditor

---

[7] The balance sheet assets do not include the Company's potential Litigation Claims against Foster and Rader.

[8] He incorporated the ranges set forth in Carickhoff's Report (Debtor's Exhibit 4) for the potential Litigation Claims.

class.  He stated his professional opinion that in a hypothetical Chapter 7 liquidation under his analysis of the Company's assets and claims: (1) if the litigation recovery is in the lower range, the Chapter 11 Administrative claims would be unable to be paid; (2) there is no possible scenario in which there would be a dividend to the general unsecured class;  and (3) even if there were no Chapter 11 administrative expenses or professional fees, there would still not be anything left for distribution to the unsecured creditors.

Cummings testified on behalf of the Unsecured Creditor's Committee about her review of the Debtor's financial records.  She testified that Clearpoint was insolvent at the end of 2017 although she could not confirm the exact date of insolvency because of the Debtor's poor recordkeeping.  With regard to the Debtor's 73.33% interest Silverback, she noted that the Debtor previously held a $2,900,000.00 receivable from Silverback and at some point losses therefrom were rolled into Clearpoint.  She also testified that although Foster and Rader each owned 50% of the Debtor, their distributions were disproportionate to their interests.  Pursuant to her review of the Debtor's Initial Projections, she explained that after the proposed $2,000,000.00 payment to ServisFirst, a reamortization of the loan would yield almost $340,000.00 more per year than the Debtor's Initial Projections provided.  She noted that many adjustments were made to Clearpoint's books including the reclassification of distributions to the insiders.  She also testified that the Debtor's September 30 and December 31,2018 financial statements both included a note disclosure addressing the fact that its liabilities exceeded its assets by millions and "Management is aware that the Company's present financial condition has created uncertainly about its ability to continue as a going concern.

9

## ANALYSIS

Section 1129 of the Bankruptcy Code governs the confirmation of plans of reorganization in Chapter 11 cases. Generally, a chapter 11 plan must be confirmed if it meets the thirteen requirements listed in §1129(a). *In re Bravo Enterprises USA, LLC*, 331 B.R. (M.D. Fla. 2005) (citing B*eal Bank, S.S.B. v. Waters Edge Limited Partnership,* 248 B.R. 668, 678 (D.Mass.2000)). The Debtor has the burden of proving each of the §1129 elements by a preponderance of the evidence. *In re J.C. Householder Land Trust # 1*, 501 B.R. 441, 448 (Bankr.M.D.Fla.2013). The Committee has asserted that the Third Amended Plan, as orally amended fails to meet the following requirements for confirmation: (1) good faith under§1129(a)(3); (2) the liquidation test under§1129(a)(7); (3) adequate disclosure under §1129(a)(5)(B); (4) the prohibition against unfair discriminatory treatment under 1129(b)(1); and (5) the absolute priority rule under §1129(b)(2)(B). The Committee also contends that the Debtor should be offered for sale under §363 and that the prior inclusion of the Debtor's Initial Projections with the Second Amended Disclosure Statement renders confirmation defective. Hence, the Court addresses each issue raised by the Committee below and ultimately concludes that the objections are not supported by the evidence presented.

### The Plan Was Not Proposed Bad Faith

To be confirmable a Chapter 11 plan must be proposed in good faith and not by any means forbidden by law. 11 U.S.C. §1129 (a)(3). The term "good faith" is not defined in the Bankruptcy Code. *In re Bravo* at 472. Instead, a plan's good faith is generally determined in light of the totality of the circumstances, and the bankruptcy judge is in the best position to evaluate the good faith of the proposed plan. *In re University Creek Plaza, Ltd.,* 176 B.R. 1011, 1018–19 (S.D.Fla.1995). In reviewing the totality of the circumstances to evaluate whether the plan was

proposed in good faith, courts generally concentrate on the plan itself, and its ability to accomplish the objectives of the Bankruptcy Code.

> In finding a lack of good faith, courts have looked to whether the debtor intended to abuse the judicial process and the purposes of the reorganization provisions. Denial of confirmation for lack of good faith "is appropriate particularly when there is no realistic possibility of an effective reorganization and it is evident that the debtor seeks merely to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." The focus [when assessing good faith in the proposal of a plan] is on "the plan itself and whether such plan will fairly achieve a result consistent with the objectives and purposes of the Bankruptcy Code." To determine good faith: the court looks to the debtor's plan and determines, in light of the particular facts and circumstances, whether the plan will fairly achieve a result consistent with the Bankruptcy Code.

*In re Valley View Shopping Center, L.P.,* 260 B.R. 10, 27–28 (Bankr.D.Kan.2001)(quoting *In re Pikes Peak Water Co.,* 779 F.2d 1456, 1460 (10th Cir.1985))(quoted in *In re Global Water Technologies, Inc.,* 311 B.R. 896, 902 (Bankr.D.Colo.2004)). See also, *In re McCormick*, 49 F.3d 1524, 1526 (11th Cir.1995)(Although good faith is not defined in the Bankruptcy Code, good faith requires that there be a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Code); *In re Sylmar Plaza, L.P.,* 314 F.3d 1070, 1074 (9th Cir.2002)(A plan is proposed in good faith where it achieves a result consistent with the objectives and purposes of the Code).

The Unsecured Creditor's Committee ("Committee") contends that the Plan is proposed in bad faith for several reasons. The Committee asserts that the discrepancy between the $1,000,000.00 initially proposed to be paid over five years in the Amended Plan (doc. 440) and the $400,000.00 offered upon the effective date in the Third Amended Plan (which was orally amended to $750,000.00) demonstrates that the plan does not comport with the Debtor's fiduciary duty to Creditors. Additionally, the Committee maintains that the substantial benefits afforded to the equity holders under the Plan is indicative of bad faith. Further, the Committee avers that the

provision in the Second Amended Plan that it called a " gun to the head provision" (which required unsecured creditors to vote in favor or the plan to take part in the distribution) evidences bad faith, was improper and renders the confirmation noticing defective.

Upon considering the totality of the circumstances, the evidence does not establish that the Debtor's Plan was proposed in bad faith within the meaning of §1129(a)(3) of the Bankruptcy Code. While the amount offered to unsecured creditors in the Plan is 75% of the amount previously proposed, the Court recognizes that a definitive payment upon the Plan Distribution Date, as opposed to a potential recovery of 25% more over a five-year term might serve to benefit the general unsecured class. This is so because of the time value of money and the risks associated with delaying the payment installments which are dependent on the future viability of the Company. The evidence established that the Debtor's circumstances have since the initial plan was proposed. The Debtor is out of cash, its assets are depreciating and its only hope of survival is by the immediate cash infusion by the Plan Sponsor. The testimony was clear that the Plan Sponsor is not willing to pay any more than the proposed amount to acquire the equity interests in the Debtor or otherwise alter the negotiated plan terms.

The Court recognizes that Foster and Rader will benefit from plan confirmation, yet those benefits do not support a finding of bad faith, considering the evidence presented. First, the injunctions the Committee complains of prevent secured creditors' collection efforts on personal guarantees executed by Foster and Rader related to the Company's secured debts which are being paid under the plan. Not only do those injunctions only apply so long as the payment obligations to the secured creditors under the plan are met but the secured creditors have consented thereto. It is reasonable for creditors who have accepted certain repayment terms to forgo collection efforts absent further default. The secured creditors' agreements not to pursue the insiders' guaranty

Case 20-12274    Doc 654    Filed 09/14/21    Entered 09/14/21 15:50:12    Desc Main
Document    Page 12 of 23

obligations pose no harm to the unsecured claimants.

Nor does the Court agree with the Committee's assertion that the Reorganized Debtor's retention of litigation claims against the insiders constitutes bad faith. Although it was essentially undisputed that viable claims exist against the insiders related to preferential transfers, fraudulent transfers, unlawful distributions and breach of duty, the expert evidence presented established that even if the potential claims against the insiders were pursued, there would be no realizable benefit to the unsecured class. In the Court's view, the evidence presented established that the benefits afforded to Creditors and the fairness of the plan terms overall outweigh any potential indicia of bad faith. Additionally, the testimony of Beech explaining that the Plan Sponsor required retention of the Insider Claims to avoid what he termed "drama" surrounding the future business of the Company provided justification for the potential benefit to the Insiders as the purpose is to avoid potential detriment to the Reorganized Debtor.

Lastly, although the "gun to the head" plan provision indicating that unsecured creditors which reject the plan would not share in the unsecured distribution was removed by amendment, the Court will nonetheless address the Committee's arguments related thereto. The Committee contends that the prior inclusion of what it termed the "gun to the head" provision constitutes bad faith and its existence and at the time the ballots were cast renders noticing defective and the plan unconfirmable. While the Court does not condone such provisions, it finds that the removal of the provision in the Third Amended Plan effectively moots the issue. Despite the Committee's assertion that the inclusion of such provision in the Second Amended Plan tainted the balloting because some unsecured creditors may have only accepted the plan for fear of otherwise receiving nothing, under the facts of this case, such argument fails. This is so because the unsecured class as a whole rejected the plan. Thus the overall result was the same, a contested confirmation

hearing.

Despite the Committee's assertions, the Court takes notice of the overall plan provisions in its analysis. The plan proposes to: (1) pay Administrative Expense Claims and Priority Tax Claims; (2) pay all Chapter 11 quarterly fees owed to the Bankruptcy Administrator after the Effective Date; (3) pay the Debtor's secured claimants pursuant as provided in the plan in full under the contractual obligations or consensual agreements therewith; and (4) yield a $750,000.00 dividend to the general unsecured creditor class. As a result, the overall effect of the Plan is to allow the Debtor to continue to operate, maintain its employees and pay its administrative, priority and secured claims and yield a dividend to the unsecured creditor class which are consistent with the objectives of the Bankruptcy Code. Therefore, upon consideration of the totality of the circumstances, the Court does not find that the Plan was proposed in bad faith.

Best Interest of Creditor's Test

Section 1129(a)(7) sets out what is commonly referred to as the "Best Interest of Creditors Test" stating:

> With respect to each impaired class of claims or interests—
> (A) each holder of a claim or interest of such class—
> (i) has accepted the plan; or
> (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.

Hence, a Chapter 11 plan proponent must prove that each rejecting claimant in an impaired class will receive no less in the Chapter 11 than the claimant would have received if the debtor were liquidated in Chapter 7. *In re Monticello Realty Investments, LLC,* 526 B.R. 902 (Bankr.M.D. Fla. 2015). "In order to show that a payment under a plan is equal to the value that the creditor would

receive if the debtor were liquidated, there must be a liquidation analysis of some type that is based on evidence and not mere assumptions or assertions." *Id.* (citing, *In re Smith*, 357 B.R. 60,67 (Bankr. M.D. N.C. 2006).

The evidence shows that the Plan satisfies the Best Interest of Creditors Test. The Debtor's witness testimony and expert reports concluded that liquidation of the Debtor's Balance Sheet Assets would not yield a dividend to general unsecured creditors. This fact was essentially undisputed. As a result, the only potential source of recovery for the general unsecured creditors is the potential claims against the insiders related to preferential transfers, fraudulent transfers, unlawful distributions, and breach of duty (the "Litigation Claims"). The Court accepted Carickhoff's expert testimony, considered him forthright and credible and found his analysis and opinions on the value and collectability of Litigation Claims reasonable and well-supported. Although Carickhoff may not have considered potential awards of attorney's fees or punitive damages, the Court still determined that his overall conclusion of the value ranges and net potential values of the Litigation Claims were relevant and persuasive. The Court noted that Carickhoff's consideration of the estimated administrative expenses and the difficulty of collection were appropriate given the evidence of the insider's financial condition and dependency in part on obtaining a successful insurance settlement of the breach of duty claims which may or may not come to fruition.

The Court also accepted Gariepy's expert testimony and considered him credible and forthright. The Court considered his analysis and in particular his calculations that: (1) if the litigation recovery is in the lower range, the Chapter 11 Administrative claims would be unable to be paid; and (2) there would need to be a $2.8 million *net* recovery before the first dollar could be paid as a dividend to the general unsecured class. So based on the evidence presented, even

assuming higher range recoveries on the Litigation Claims, the Court finds that liquidation of the Debtor's assets, would not likely yield a dividend to the general unsecured creditor class greater than $750,000.00. Therefore, the Plan satisfies the Best Interest of Creditors Test.

<u>The Plan Provides Adequate Disclosure Under §1129(a)(5)(B)</u>

The proponent of the plan must disclose the identity of any insider that will be employed or retained by the reorganized debtor, and the nature of any compensation for such insider. 11 U.S.C. §1129(a)(5)(B). The Bankruptcy Code indicates that if the debtor is a corporation the term "insider" includes the following:

> . . .
> (i) director of the debtor;
> (ii) officer of the debtor;
> (iii) person in control of the debtor;
> (iv) partnership in which the debtor is a general partner;
> (v) general partner of the debtor; or
> (vi) relative of a general partner, director, officer, or person in control of the debtor; . . .

11 U.S.C. §101(31)(B).

Todd Rader and Harlan Foster are insiders as each of them hold fifty percent membership interest in the Debtor. However, under the proposed plan their equity interests will be terminated. The Debtor's Second Amended Disclosure Statement reflects that the Plan Sponsor formed Chemco Innovations Holdco, LLC to serve as the vehicle for the plan transaction, and that the new equity holder will be capitalized through investments from the plan sponsor and other outside investors including Todd Rader in a minority, non-controlling capacity.(Doc. 518 at 13). In response to the Committee's contention that the Debtor did not specify the nature of compensation for Rader, the testimony of Beech on behalf of the Plan Sponsor confirmed that: (1) neither Rader nor Foster will maintain any

16

direct interest in the Reorganized Debtor; (2) neither Rader nor Foster will hold any management or executive positions in the Reorganized Debtor; and (3) although Rader will have a small (less than 2%) interest purchased for him in Chemco, he will not hold any personal, individual interest in the Reorganized Debtor and he does not have any employment or compensation agreement with the Reorganized Debtor. Therefore, the testimony was consistent with the Debtor's disclosure.

The Disclosure Statement was previously approved on an Interim Basis (doc. 534) and the Committee previously stipulated to its adequacy. (Doc.633 at 5 ). Yet even if the absence of more detailed information concerning Rader's interest is considered deficient, the Court concludes that it would be harmless. This is so because as a practical matter, if further details would have caused other unsecured creditors to reject the plan, the result would have been the same in that the class as a whole already rejected the plan and raised the issue. The Court simply does not find that under the circumstances, further disclosure or noticing is required or that the disclosure is inadequate.

### The Plan Does Not Violate The Absolute Priority Rule

Section 1129 of the Bankruptcy Code provides in part:

> **(B)** With respect to a class of unsecured claims--
> **(i)** the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or
> **(ii)** the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

In its simplest terms, the absolute priority rule requires creditors to be paid in full before

any lower priority participant, such as an equity holder, may share in the assets of the reorganized entity. *In re Lett*, 632 F.3d 1216 (11th Cir. 2011); *In re Experient Corp.,* 535 B.R. 386 (Bankr. D. Colo. 2015). An exception to this rule has been recognized if the junior claimant makes a cash infusion which is necessary and substantial to the debtor. *In re Hendrix*, 131 B.R. 751, 753 (Bankr. M.D. Fla. 1991)(citing *Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110 (1939)). The Supreme Court has noted that ". . .under the commonsense rule that a given phrase is meant to carry a given concept in a single statute, . . . the better reading of subsection (b)(2)(B)(ii) recognizes that a causal relationship between holding the prior claim or interest and receiving or retaining property is what activates the absolute priority rule." *Bank of America National Trust & Savings Ass'n v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 435; 119 S.Ct. 1411, 1413 143 L.Ed.2d 607 (1999).

In this case, although Rader as an insider of the Debtor may be obtaining a small, minority interest in the entity which will hold the membership interest in the reorganized debtor such does not contravene the absolute priority rule. This is true because not only will Rader's not have a direct interest in the reorganized debtor, the interest will not be given "on account of" his claim or interest in the Debtor and it will be for new value tendered on his behalf. The testimony offered by Beech as the Plan Sponsor clarified that funds tendered on Rader's behalf to acquire approximately 2% of Chemco, are not attributable to Rader's prior equity or creditor interest in the Debtor but were based on Rader's individual skills and relationships as a good business development person and an anticipated consulting arrangement which would likely benefit Chemco and the Reorganized Debtor. Thus, considering the evidence presented, the Court finds that there is no violation of the Absolute Priority Rule.

<u>The Plan Does Not Discriminate Unfairly Against The General Unsecured Creditor Class</u>

Generally, to meet the requirements for confirmation impaired creditors must vote to accept the plan. 11 U.S.C. §1129(a)(8). Notwithstanding the forgoing, a plan may be confirmed despite the rejection by an impaired class if it meets what is commonly known as the "cramdown" provision of the Bankruptcy Code which states:

> ...
> (b)(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

11 U.S.C. § 1129(b).

As noted above, the Ballots submitted (doc.625) reflect that the general unsecured creditors in Class 6 rejected the Plan. Consequently, the Debtor's Plan does not satisfy the §1129(a)(8) requirement. Therefore, to confirm a "cram down" over the rejection by an impaired class of claims or interests: (1) the Plan must satisfy all of the other requirements listed in §1129(a), apart from the requirement that each class accept the plan and (2) the Plan must not discriminate unfairly, and must be fair and equitable with respect to each class of claims or interests that rejected the Plan. *Beal Bank, S.S.B. v. Waters Edge Limited Partnership*, 248 B.R. 668 (Bankr D. Mass 2000).

A plan unfairly discriminates "when it treats similarly situated classes differently without a reasonable basis for the disparate treatment." *In re Young Broadcasting Inc.*, 430 B.R. 99, 139–40 (Bankr.S.D.N.Y.2010); *In re Johns–Manville*, 68 B.R. 618, 636 (Bankr.S.D.N.Y.1986). "The pertinent inquiry is not whether the plan discriminates, but whether the proposed discrimination is 'unfair.'" *In re Unbreakable Nation Co.*, 437 B.R. 189, 202 (Bankr.E.D.Pa.2010) (quoting *In re Armstrong World, Inc.*, 348 B.R. 111, 121 (D.Del.2006). The discrimination (1) must have a

reasonable basis; (2) must be necessary to consummate the plan; (3) must be proposed in good faith; (4) and must be in direct proportion to its rationale. *Mercury Capital Corp. v. Milford Connecticut Associates, L.P.*, 354 B.R. 1, 10 (D.Conn.2006).

As noted on the Ballot Report, the unsecured claims class (denoted as Class 6) is the only impaired class which voted to reject the Plan. (Doc. 625). The impaired secured claims (denoted as Classes 2, 3 and 4) voted to accept the plan and the impaired equity interest (denoted as Class 7) were deemed to have rejected the plan and did not vote. The Court has determined above that the Plan does not violate the other requirements for confirmation. Hence, the Court only need address whether the treatment of the unsecured claims unfairly discriminates. The general unsecured claims are classed together as they are all similarly situated in status and priority. There is only one class of general unsecured claims and with the elimination of the "gun to the head" provision, they are all treated similarly and will each share in the distribution to such class on a pro rata basis.

Although the Committee contends that the plan discriminates because the plan proposes to pay 100% of secured claims, when their collateral may be worth less than the associated debt, the Court does not find such argument compelling. The Court first notes that the Secured Creditors timely filed their claims as secured and since they have not been objected to, they are entitled to be treated as prima facie evidence of their amount and validity. The Court recognizes that due to the nature of the secured creditors' interests there is a reasonable basis to treat the secured claims differently than the unsecured claims. The testimony established that the secured creditors hold liens on the Debtor's Balance Sheet Assets which are necessary to consummate the plan. Since the Court has already concluded that the Plan was not filed in bad faith, the Court hereby finds that the Plan does not unfairly discriminate under §1129(b).

<u>The Committee's Additional Arguments Against Confirmation Lack Merit</u>

The Committee's assertion that the Plan is in effect a sale and the Debtor should be required to auction the Company is not supported by the evidence. The Plan Sponsor's testimony was clear that Highground: (1) intends to continue to operate the Reorganized Debtor under new management; (2) does not simply want acquire its assets; (3) would not be interested in purchasing the Company at a sale if the case is converted to Chapter 7 because its value is as a going concern; and (4) is not willing to serve as a stalking horse bidder. Further, Foster's testimony established that he marketed the Debtor extensively for quite some time and Highground's agreement to sponsor the Plan was the only viable option to save the Company from imminent failure. Based upon that testimony, the Court is satisfied that further delay attributable to efforts toward any potential §363 sale would not only be futile but also likely result in the demise the Company to the detriment of the creditors.

Additionally, the Committee contends that the inclusion of the Debtor's Initial Projections (Doc.522), with the Second Amended Disclosure Statement, which are now irrelevant, renders the disclosures inadequate. The Committee recognized that the purpose of the disclosure provisions in Chapter 11 is to provide holders of claims and interests with "adequate information" to make an informed judgment about the plan and its feasibility. (Doc. 648)(citing *In re: Conco, Inc.,* 855 F. 3d, 703 (6th Cir. 2017); *In re Concrete Designers, Inc.* 173 B.R. 354 (Bankr. S.D. Ohio 1994). In this case, any perceived discrepancy or disclosure of irrelevant information is not detrimental to the General Unsecured Creditors because (1) feasibility is not in issue as the Plan Sponsor testified that it has the ability to fund the plan; (2) the Plan as now proposed provides better treatment to the general unsecured class than previously proposed; and (3) the initial liquidation analysis which was disclosed, reached the same material conclusion as the evidence presented at

the hearing, that in a liquidation scenario there would be no available funds for distribution to general unsecured creditors.

Further, and perhaps more importantly, the Court agrees with the position of Debtor's counsel that the Committee lacks standing to raise objection to the Final Approval of the Disclosure Statement because, the class it represents, voted to reject the plan. (Doc. 647)(citing, *In re Middle Plantation of Williamsburg, Inc.,* 47 B.R. 884, 891 (Bankr. E.D. Va. 1984)("Holders of impaired claims who have been induced to vote in favor of a plan are the only ones who may raise the issue of the adequacy of the Disclosure Statements), aff'd 755 F. 2d. 928 (4th Cir. 1985). Accordingly, the Committee's contests to the Plan and adequacy of the disclosures fail on all counts.

## **CONCLUSION**

Based on the forgoing, the Court hereby finds that the Disclosure Statement is sufficient and the Plan as proposed satisfies the requirements of 11 U.S.C. §1129. Accordingly, it is hereby ORDERED, ADJUDGED and DECREED that the Objections of the Unsecured Creditor's Committee are OVERULED, the Disclosure Statement is finally APPROVED and the Plan, as orally amended, will be CONFIRMED by separate order. It is further ORDERED that the appeal time shall run from the entry of this Memorandum Order.

Dated: September 14, 2021

JERRY C. OLDSHUE, JR.
U.S. BANKRUPTCY JUDGE

23